Johnson, J.
From the above statement it will be seen that the controversy grew out of the provision contained in the ordinance granting the franchise passed by the village in November, 1901, as follows: “Should the village of Pleasant Ridge be annexed to the city of Cincinnati the rate of fare charged for a ride in either direction between *115 any point in said village and the Cincinnati terminus shall not exceed five cents and transfers.”
It is shown by the record that in September, 1901, The Rapid Railway Company mhde application to the council of the village for the right to construct and operate a street railway on and over the Montgomery road within the villáge, and that on the 23 d of that month the village advertised for bids for the construction and operation of the road, asking that the bids should state the rates of fare for passengers on that route. The Rapid Railway Company submitted its bid on October 15 and the clause above quoted was inserted by agreement of the parties at the time the franchise ordinance was passed, and the ordinance was thereafter duly accepted by the company.
The attack upon the judgments below is based upon the claim that the provision of the franchise quoted is without any validity or binding force.
The position of the Interurban Company substantially is that the village was wholly without authority to prescribe or contract for fares beyond the municipal limits, and that notwithstanding that clause was, by agreement of the parties, included in the ordinance as adopted, which was thereafter accepted by the grantee, and, although the line was constructed and operated under and by virtue of the franchise .and is now maintained and operated thereunder, nevertheless it is entitled to disregard and eliminate the provision objected to, and yet retain and enforce the rights and privileges granted to it by the other terms of the franchise,
*116 For a great many years, by consistent statutory provisions, the plan of constructing street railways by grants of the municipalities in which they were constructed has been fixed. The procedure has consisted of the establishment of the route by the municipality and the granting of the privilege to the bidder who, after public advertisement, agrees to carry passengers upon the proposed railroad at the lowest rates of fare. It is not contended that any municipality has the power to grant a franchise for a street railway to be constructed and operated entirely within the corporate limits, except in the manner indicated. Street railroads originally used’ animal power for the movement of their cars. They were designed almost exclusively to furnish facilities for passenger traffic within the limits of the particular municipality. When electric power was applied in street-railway operation, it resulted in the extension of street-railway lines into suburban districts and between cities and towns. In view of this condition, and in response to the general demand for increased traffic facilities between cities and districts around and about them, the act of May 17, 1894 (91 O. L., 285), now included in Sections 9117 to 9122, General Code, was passed. By the terms of this act authority is given for the construction and operation of electric street railroads upon highways outside of municipalities or in private rights of way. By Section 4 of the act authority is given such companies to lease, purchase or make traffic arrangements with any other street railway company as to so much of its track and other property as is neces *117 sary or desirable to enable them to enter or pass through a city or village, upon the terms and conditions applicable to other street railroads; and by Section 6 it is provided that such companies -shall be subject to regulations provided for street railroads and have all powers,- so far as they are applicable, that other street-railway companies possess.
It will be seen that the provisions of the act referred to relate to the construction, maintenance and operation of electric railroads on highways outside of municipalities. Of course the legislature must have contemplated that interurban roads would be projected through municipalities and that it would be impracticable to construct such a road without some means of passing through cities and villages that might be along the route. The statute, therefore, authorized- the - making of the traffic arrangements referred to with other street-railway companies operated within the municipalities. In the event that there was no street railway in the city or village through which the interurban company desired to operate, there was no special provision. Section 6 (Section 9122, General Code), however, as pointed out, provided that such company shall be subject to the regulations provided for street railroads and have all powers, in so far as they are applicable, that other street-railway companies possess. Therefore, the right of an interurban company, to extend its line into and through municipal corporations, was fixed by the statutes in force prior to the passage of the interurban law referred to. By Section 3437, Revised *118 Statutes, now Section 9100, General. Code, it was .provided that “Street railways * * * may be constructed or extended within or without, or partly within and partly without, any municipal corporation,” and Section 3438, Revised Statutes, as in force when the ordinance in question was passed, provided that the right to construct or extend such line within or beyond the limits of a municipal corporation could be granted only by the council thereof, by ordinance, and the right to construct such railway within or beyond the limits of an unincorporated village could be granted only by the county commissioners. The last clauses of the section are “except, however, in granting permission to extend existing routes in cities of the first, second and third grade of the first class, and first grade, second class, such cities, and the companies owning such route, shall have the same rights and powers they have under the laws and contracts now existing; and that no extension of any street railroad located wholly without any such city, or of any street railroad wherever located, which has been or shall be built in pursuance of a right obtained from any source or authority other than a municipal corporation, shall be. made within the limits of such city, except as a new route, and subject to the provisions of sections two thousand five hundred and one and two thousand five hundred and two,” Revised Statutes, which provide for bids, etc.; and Section 3439, Revised Statutes, provided for the filing of written consent of the owners of Jnore than one-half of the abutting property. Section 3443, Revised Statutes, now Section 9113, *119 General Code, provided that the “Council, or the commissioners, as the case may "be, shall have the power to fix the terms and conditions upon which such railways may be constructed, operated, extended, and consolidated.”
The foregoing is substantially a statement of the statutory provisions on the subject at the time of the granting of the franchise involved in this suit.
It will be observed that the provisions of Section 3438, Revised Statutes, part of which is now Section 9104, General Code, relate to the extension of a street railway to be made “within the limits of such city.” It is well known that as a general proposition street railways are not constructed in villages except for the purpose of interurban traffic, and that the people in the great majority of villages throughout the state have almost no need for a street railway operated entirely within the limits of their own village. For instance, it is very apparent from this record that the paramount purpose of the village of Pleasant Ridge was to provide interurban service for its residents, as well as that the railroad company entered into the transaction solely to carryout its general interurban plan.
It admits in its answer that it is an interurban electric railway corporation; that the village of Pleasant Ridge is one of the municipal corporations into and through which The Rapid Railway Company constructed, maintained and operated its interurban electric railway from Cincinnati to the village of Lebanon, and that “its railway on1 the streets named in the ordinance set forth in th¿ petition was constructed under and by virtue of said grant and *120 franchise and is now maintained and operated by this defendant thereunder.”
It appears from the record that The Rapid Railway Company had submitted bids, for rates of fare through the village over Montgomery road and other points, naming rates and places, including Fountain Square, Cincinnati.
Circumstances and situations of this nature were so general that the legislature contemplated them when it adopted the provisions of the law, including Section 9122, General Code, which we have pointed out. The provision is plain that no extension of ¿ street railway located wholly outside of such city, or of one wherever located, which is built in pursuance of a right obtained from authority other than that of a municipal corporation, shall be made within the limits “of such city,” except as a new route, but there is no such provision with reference to the extension of a street railway through the limits of a village. It was recognized that such a road might pass for a very short distance through the limits of villages and yet be necessary to the carrying out of the purpose to furnish interurban passenger service to people living in rural districts of the state or in suburban villages in the neighborhood of large centers. It follows that as to villages the construction or extension of an interurban road was then controlled by the general terms of Sections 3437 tq 3443, Revised Statutes, and that the village council was empowered to grant the right to construct or extend the line within or beyond the limits of the village, and by Section 3443 to fix the terms and conditions thereof.
*121 In The Citizens’ Electric Rd. Co. v. County Commissioners, 56 Ohio St., 1, it was held that an ordinance adopted by a city council under Section 3438, Revised Statutes, simply confers on a street railroad company the corporate power to extend its road over a state or county road. In the exercise of the power the right to so extend its road can only be acquired by agreement with the commissioners or by condemnation. The court say: “Without such ordinance a company could not extend its road within or without the municipality. As a corporation it has, without the ordinance, no such power.”
By the first section of the interurban act of 1894, above referred to, the corporate power is conferred upon companies to construct electric street railroads upon highways outside of municipalities, but the ‘right to extend within or without the municipality must still be secured from the municipality itself.
In the absence of statutory provision to the contrary the village was empowered to stipulate as one of the “terms and conditions” which it was authorized to fix by the provisions of Section 3443, Revised' Statutes, for a certain rate of fare for a road from any point in its limits to a point outside of its limits. It would not be disputed- that the rate of fare, to -be charged to and from points in the village to points outside is a matter of interest to the municipality and its residents and a proper subject of negotiation with the company in connection with the grant. It was a matter for mutual consideration and agreement between the parties. Therefore, when the grant was made and accepted with the provision as to the fare included, it became one *122 of the considerations of the grant and one of the elements in the making of the binding contract between the parties, it is familiar law that when the terms of a valid ordinance are accepted by a grantee, such action constitutes a contract, and the rights of the parties are to be determined by the terms of the contract itself. City of Columbus v. Street Rd. Co., 45 Ohio St., 98; The Cincinnati & Springfield Ry. Co. v. Village of Carthage, 36 Ohio St., 631; The East Ohio Gas Co. v. City of Akron, 81 Ohio St., 33; City of Cleveland v. Cleveland City Ry. Co., 194 U. S., 517.
It will be observed that the clause which is here attacked is limited in its application. It is not an attempt to fix fares generally for passengers, except in the specific cases provided for. It only affects a ride in either direction between any point in the village and the Cincinnati terminus, and was not to be effective unless and until the village should be annexed to the city of Cincinnati.. The provision does not attempt to fix fares between points in the former village of Pleasant Ridge and Norwood, or between any intervening points and Cincinnati or elsewhere.
In other jurisdictions this view of the case has been sustained. In Rice v. Detroit, Y. & A. A. Ry. Co., 122 Mich., 677, the court said: “It is contended that the franchise is in force only within the territorial limits of the village, and does not cover territory in other townships. We do not think this contention can be sustained. The franchise is in the nature of a contract, and imposes obligations upon the company which those having occasion to ride *123 from Dearborn to Detroit have a right to enforce. * * * The defendant saw fit to contract with the village of Dearborn for a rate outside of the limits of the village. * * * This contract it cannot repudiate.”
Like views have been held in People v. Suburban Rd. Co., 178 Ill., 594; Vining v. Detroit, Y., A. A. & J. Ry. Co., 133 Mich., 539; Selectmen of Westwood v. Dedham & F. St. Ry. Co., 209 Mass., 213; Public Service Comm. v. Westchester St. Rd. Co., 206 N. Y., 209.
It is insisted that the enforcement of the terms of the franchise under inquiry here will work hardship and irreparable injury to the company; and cases are cited in support of the accepted proposition that neither the state nor any of its agencies can, by regulation or legislation, withhold from the owners of the railroad just compensation for its services. But in this case we are dealing with the subject of contract. It implies a meeting of minds. It is much to be regretted if the amount which the interurban company is required to pay to the Cincinnati company for the use of its tracks is too large a proportion of the fares received, and it is equally to be regretted if the fare provided by the contract itself does not furnish a compensatory return to the company. The presumption is that it was to the interest of the village and to every municipality to provide such a compensation for the services to be rendered by the public utility as will induce the investment of the capital necessary to the furnishing of the service. In fact, it may be said that it is the duty of the municipal and other authorities *124 to provide sufficient compensation. It is equally the duty of the company not to contract to perform a service for less compensation than is proper.
But we are not able to see how the court can alter the terms of the contract in this case as the parties made it. The only thing the court can do is to enforce the contract as it finds it, and to hold that as long- as the company continues to operate under the franchise it must submit to the terms thereof.
The judgment will be affirmed.

Judgment affirmed.

Donai-iue, Wanamaker, Jones and Matthias, JJ., concur.
Nichols, C. J., not participating.